IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 17-cv-01440-LTB

MICHELLE DEBORAH WEISBLAT-DANE,

        Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

        Defendant.

_____

ORDER
_____

Plaintiff, Michelle Deborah Weisblat-Dane, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for widow's insurance benefits for a period of disability, filed pursuant to Title II of the Social Security Act 42 U.S.C. § 401, *et. seq.*, and her application for supplemental security income, filed pursuant to Title XVI of the Social Security Act 42 U.S.C. § 1381 *et. seq.* Jurisdiction is proper under 42 U.S.C. § 405(g). Oral argument would not materially assist me in the determination of this appeal. After consideration of the parties' briefs, as well as the administrative record, I REVERSE AND REMAND the Commissioner's final order.

## I. STATEMENT OF THE CASE

Plaintiff seeks judicial review of the Commissioner's decision denying her applications for disabled widow's insurance benefits and for supplemental security income. After these applications were initially denied on August 14, 2015, an

Administrative Law Judge ("ALJ") held an evidentiary hearing on January 26, 2017 [AR 74-105, 33-73], and thereafter issued a written ruling dated March 30, 2017. [AR 9-27]  The ALJ denied her applications on the basis that Plaintiff was not disabled because her assessed residual functional capacity ("RFC") did not preclude her from performing her past work as a bookkeeper (Step Four). [AR 25]  Alternatively, the ALJ found that Plaintiff could perform work existing in significant numbers in the national economy considering her age, education, work experience and assessed RFC (Step Five). [AR 26]

The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, without specific comment, making the SSA Commissioner's denial final. [AR 1-5]  Plaintiff timely filed her complaint with this court seeking review of the Commissioner's decision.

## II. FACTS

Plaintiff was born on December 14, 1963, and she has a least a high school education. [AR 26, 215, 679]  Her prior employment includes work as a bookkeeper and as a driver. [AR 39-40, 215-16]  Plaintiff alleged that she stopped working in December of 2010 due to her depression, blocked artery, compressed disc, degenerative disc disease, borderline personality disorder with post-traumatic stress disorder (PTSD), fibromyalgia, diabetes, pulmonary clogged artery disease, asthma, osteoarthritis, damaged cartilage, migraine headaches, and obesity. [AR 214]  Plaintiff's alleged onset date was March 19, 2013 – the date of her last unsuccessful application for disability insurance benefits. [AR 12, 77]

The medical evidence in the record regarding Plaintiff's physical health is summarized as follows. Prior to her alleged onset date in March of 2013, Plaintiff went to the emergency room, on February 29, 2012, reporting back pain. [AR 427-32] An MRI at that time revealed mild disc degeneration at L3-L4, and mild facet hypertrophy, moderate left and mild right hypertrophic facet osteoarthritis at L4-L5, and minimal disc degeneration with 2 mm left subligamentous disc protrusion and mild bilateral hypertrophic facet osteoarthritis at L5-S1. [AR 435]

During September of 2012, Plaintiff saw Brenda E. Walker-Conner, M.D. at Peak Vista Community Health Centers, for shoulder pain and arthralgia, forearm pain, right knee pain, and lower back pain. [AR 405-406, 408] An x-ray of Plaintiff's lumbar spine on September 12, 2012, revealed no significant abnormalities and an x-ray of the cervical spine revealed mild cervical spine degenerative changes. [AR 436-37] During an initial physical therapy evaluation on September 25, 2012, Plaintiff reported pain, and that she was unable to sit for longer than two hours without her pain increasing "dramatically." [AR 553-55] Dr. Walker-Conner assessed Plaintiff with degenerative disc disease, and referred her for a functional capacity evaluation and aquatherapy, on December 13, 2012. [AR 399-401]

On February 2, 2013, Plaintiff again visited the emergency room because of worsening back and hip pain. [AR 545-46] On February 20, 2013, Plaintiff was evaluated by David Wilber, MPT, at the Memorial Health Systems Outpatient Rehabilitation Services. [AR 424-25] Mr. Wilber filled out a Physical Capacity Evaluation form indicating that Plaintiff could sit for a maximum of three hours

3

and stand and walk for less than two hours in an eight-hour workday. [AR 425] He further indicated that she was unable to lift 5 pounds from the floor to her waist, but she could carry 5 pounds for ten feet at waist level. [AR 425] He also noted that Plaintiff needed to lie down periodically throughout the day due to pain and/or fatigue. [AR 425]

After her alleged onset date of March 19, 2013, Plaintiff started seeing Mark Engelstad, M.D., at Partners In Health Family Medicine in April of 2013 for acute health care concerns, as well as her complaints of chronic joint pain, back pain, body-wide pain, chest pain, headaches, depression, anxiety, and borderline personality disorder. [AR 613-78, 712-41] Plaintiff also occasionally sought treatment at the hospital for acute sinusitis, acute bronchitis, and chronic gastrointestinal symptoms. [AR 392-95, 771-92]

On April 17, 2013, Plaintiff underwent an x-ray of her cervical and thoracic spine, which revealed mild and mild-to moderate degenerative disc disease. [AR 648, 650-51] On May 3, 2013, Plaintiff reported to Dr. Engelstad that she was trying to walk about 5 miles per week. [AR 619] On July 9, 2013, Dr. Engelstad noted that Plaintiff was exercising "rigorously" twice weekly, and walking "intermittently" daily, but in his proposed plan for Plaintiff's degenerative disc disease he noted "severe mobility limitations." [AR 620] In an office note dated February 21, 2014, Dr. Engelstad listed and assigned diagnosis codes for Type II diabetes, low back pain, acute sinusitis, UTI, fibromyalgia, borderline personality disorder, osteoarthrosis, and edema. [AR 623-624]

4

On March 3, 2014, Plaintiff went to the emergency room reporting joint pain and a painful rash. [AR 485] Thereafter, on March 25, 2014, Plaintiff went to the University of Colorado Hospital for consultation regarding a possible connective tissue condition. [AR 470-80] On examination, Matthew Taylor, M.D., found that Plaintiff's joints looked and felt normal, had no deformities, no crepitus (catching or clicking), and no swelling, and that Plaintiff had normal reflexes and no neurological deficits. [AR 474] Dr. Taylor indicated that he was "uncertain as to how to best explain her issues" and stated as follows:

> I do not believe she has Ehlers Danlos syndrome or any hypermobility syndrome. I do not believe she has Marian syndrome. While fibromyalgia and obesity could contribute to some joint pain and problems, the degree of problems as well as the joint dislocations (not demonstrated at the visit, but apparently recurrent) and the family history of these problems in others argues against blaming all her symptoms on her weight and fibromyalgia.
> . . .
> I said that at this point I acknowledge her symptoms but am not certain about whether/what disease process is in play here. [AR 470]

X-rays of Plaintiff's joints at this time revealed mild osteoarthrosis of the bilateral hip and knee joints, and mild degenerative disease in the lower lumbar and pubic symphysis. [AR 479-80]

On September 26, 2014, Plaintiff went to the emergency room complaining of worsening back pain. [AR 489-501] Physical examination of Plaintiff's lumbar spine exhibited decreased range of motion, tenderness, bony tenderness, pain, and spasm. [AR 492] MRI imaging at that time revealed "no evidence of focal disk bulge, disk herniation, or central spinal stenosis at any level," but she was admitted to the

5

hospital for physical therapy because she was unable to sit up out of bed. [AR 489, 498, 524-25, 645]

On January 2, 2015, Plaintiff again reported to the emergency room complaining of abdominal pain, back pain and fever, after nausea and vomiting the previous day. [AR 502-08] An abdominal CT scan and blood tests at that time were unremarkable. [AR 507] Plaintiff continued to treat with Dr. Engelstad through 2015 and 2016 for the same medical issues. [AR 713-41] Plaintiff also received Chronic Pain Management Care from September of 2015 through September of 2016 from AspenPointe. [AR 743-54]

On July 30, 2015, Plaintiff attended a consultative psychological examination with LeAnna DeAngelo, Ph.D. [AR 679-83] Dr. DeAngelo opined, after psychological testing and a mental status examination, that Plaintiff had mild or moderate limitations in tasks related to understanding, remembering, and carrying out simple work and interacting with supervisors, coworkers, and the general public, and marked impairment in performing complex work-related tasks and completing an average workday without interruption from her psychological symptoms. [AR 682-83]

Plaintiff also saw Timothy Moser, M.D., for a consultative physical examination on August 1, 2015. [AR 685-91] Dr. Moser's examination revealed no spinal pain during a straight leg-raise test, but her strength was otherwise difficult to assess due to poor effort. [AR 688-89] Dr. Moser opined that Plaintiff could stand and walk up to six hours in an eight-hour workday, she needed a cane to ambulate,

6

and could only occasionally climb, balance, stoop, kneel, crouch, and crawl due to lower extremity weakness. [AR 689] He further opined that Plaintiff was restricted from working at heights and around heavy machinery, and was restricted from any exposure to temperature extremes, chemicals, and dust/fumes/gases because of her asthma. [AR 689]

On August 11, 2015, Estela Fitzpatrick, the SDM at the Initial Disability Determination, reviewed Plaintiff's records and opined that Plaintiff was limited to occasionally lifting and carrying 20 pounds, and could stand and/or walk and sit about 6 hours in a 8-hour work day. [AR 85-88] She also opined that Plaintiff could occasionally climb ramps or stairs, stoop, kneel, crouch, crawl, and could never climb ladders, ropes or scaffolds. [AR 86] She should avoid concentrated exposure to extreme cold and heat, fumes, odor, dusts, gases and poor ventilation, and hazards. [AR 87] In addition, Mark Suyeishi, Psy.D., reviewed Plaintiff's medical records on August 13, 2015, and opined that Plaintiff did not have a severe mental impairment. [AR 84]

On October 25, 2015, Dr. Engelstad completed physical and mental functional capacity forms for Plaintiff. [AR 693-702] On a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form, Dr. Engelstad opined as to Plaintiff's work restrictions based on her fibromyalgia, chronic back pain, chronic depression, hypermobile joints, borderline personality disorder, osteoarthrosis, degenerative disc disease, migraine, and neuropathy. Dr. Engelstad indicated that Plaintiff could lift up to 20 pounds occasionally, and could carry up to

7

10 pounds occasionally, as well as sit for 45 minutes at one time, stand for 20 minutes, and walk for 20 minutes at a time. [AR 693-4, 698] He further opined that Plaintiff could sit for a total of 3 hours, stand for one hour, and walk for one hour in an 8-hour day, but that she would need to spend the remainder of the day lying down. [AR 694] He stated that she needed a cane to ambulate. Dr. Engelstad also opined that Plaintiff could reach, handle, finger, and push/pull occasionally with both hands, and could feel frequently, and she could only occasionally use foot controls. [AR 695] She could occasionally climb stairs and ramps and balance, but could never do any of the other postural activities, and could only occasionally or never be exposed to any of the listed environmental factors except humidity and wetness, which she could be exposed to frequently. [AR 696-97] Although he is not a mental health practitioner, Dr. Engelstad also filled out a "Mental Functional Assessment" form on which he opined that Plaintiff had marked or extreme deficiencies in many areas of her mental functioning, and would need to miss work about 25 days a month because of her mental impairment or its treatment, and thus she could not work on a regular and sustained basis. [AR 699-702]

On March 30, 2016, imaging of Plaintiff's cervical spine revealed mild degenerative changes throughout the spinal column, with no significant spinal cord or vertebral disease, stenosis, or nerve impingement. [AR 757-60] Imaging of her thoracic spine revealed mild chronic degenerative changes, with no significant vertebral abnormality or spinal cord lesion, significant stenosis, or nerve impingement. [AR 761] Plaintiff saw a chiropractor twice for treatment of her back

8

pain in July and November of 2016. [AR 706-10]

After the ALJ issued her decision in March of 2017, Dr. Engelstad provided a treating source statement on Plaintiff's behalf, dated April 19, 2017. [AR 839] Dr. Engelstad expressed that is was his opinion that Plaintiff was "very clearly permanently disabled" and unable to work. [AR 839]

### III. LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

Widow's disability benefits are provided as part of Title II of the Social Security Act. 42 U.S.C. §402(e). However, the definition of "disability" applied to a widow's disability claim is stricter than that applied to the claims of disabled wage earners. While the disability benefits program for wage earners requires that the claimant only show that he is unable to participate in "any substantial gainful work," the disabled widow's benefits provision requires that the claimant show that she cannot engage in "any gainful activity." 42 U.S.C. § 423(d)(2)(B)(a widow shall not be determined to be under a disability "unless . . . her physical or mental impairment or impairments are of a level of severity which under regulations

9

prescribed by the Secretary is deemed to be sufficient to preclude an individual from engaging in any gainful activity"). experience. 20 C.F.R. § 404.1520(d); *Davidson v. Sec'y of Health & Human Servs.*, 912 F.2d 1246, 1253 (10th Cir. 1990).

The sequential evaluation process used to determine whether a claimant is disabled starts with Step One, which is a determination of whether the claimant is presently engaged in substantial gainful activity. If she is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520 (e)&(f), 416.920(e)&(f).

Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to

perform other work in the national economy in view of her age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

### IV. ALJ's RULING

As an initial matter, the ALJ first found that Plaintiff met the non-disability requirements for disabled widows benefits as the unmarried widow of the deceased insured worker that had attained the age of 50. [AR 14] The ALJ also ruled that the prescribed period for determining Plaintiff's disability, related to her application for disabled widow benefits pursuant to 42 U.S.C. §402(e)(5), ended on October 31, 2019. [AR 25]

The ALJ concluded, however, that Plaintiff was not disabled at Step Four of the sequential process. [AR 25-6] The ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of March 19, 2013 (Step One). [AR 15] The ALJ further ruled that Plaintiff had the severe impairments of: degenerative disc disease, migraines, obesity, osteoarthritis of the left hip and knee, depression, anxiety, and narcissistic personality disorder (Step Two). [AR 15] The ALJ concluded, however, that these impairments did not meet or medically equal a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [AR 15]

The ALJ then determined that Plaintiff retained the RFC to perform light work except that she could lift, carry, push and or pull 20 pounds occasionally and 10 pounds frequently. She could sit, stand, and or walk for up to six hours each in an eight-hour workday with an ability to sit or stand at the workstation as needed

11

while remaining on task, but she needs a cane to ambulate. She could occasionally balance, stoop, kneel, crouch, and crawl, but she could never climb ladders, ropes, or scaffolds, and could never be exposed to unprotected heights or hazardous machinery. She could also never be exposed to extreme cold or extreme heat, and can have no concentrated exposure to environmental irritants, and could not perform fact-paced production work. Finally, Plaintiff could occasionally interact with the general public. [AR 17-8]

Based on this assessed RFC, the ALJ found that Plaintiff was able to perform her past relevant work as a bookkeeper at Step Four. [AR 25] The ALJ also ruled, in the alternative, that Plaintiff could perform work existing in significant numbers in the national economy considering her age, education, work experience and assessed RFC (Step Five). [AR 26] As a result, the ALJ concluded that Plaintiff was not disabled at Steps Four and Five of the sequential process and, therefore, was not under disability as defined by the SSA. [AR 27]

## V. STANDARD OF REVIEW

This court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000). Thus, the function of my review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom; if they are so supported, they are conclusive upon

12

[this] reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen, supra*, 822 F.2d at 1521 (*citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d. 842 (1971)). I may not re-weigh the evidence or substitute my judgment for that of the ALJ. *See Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987); *Cagle v. Califano*, 638 F.2d 219, 220 (10th Cir. 1981). With regard to the application of the law, reversal may be appropriate when the SSA Commissioner either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir. 1996).

## VI. APPEAL

Plaintiff's argument on appeal is that the ALJ erred when finding that her fibromyalgia was not a medically determinable impairment at Step Two. Specifically, she contends the ALJ's conclusion that her fibromyalgia was not a medically determinable impairment "due to a lack of objective evidence" – in that "[t]he medical record of evidence does not contain a diagnosis of fibromyalgia" – constitutes reversible error because she was, in fact, previously diagnosed with fibromyalgia based on a tender point examination. [AR 15] Plaintiff contends that this error at Step Two improperly impacted the ALJ's analysis of the remainder of the sequential process.

13

Fibromyalgia "is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." Soc. Sec. Ruling ("SSR") 12-2p, 2012 WL 3104869. Under SSR 12-2p, an ALJ may find that a claimant has a medically determinable impairment of fibromyalgia if three requirements are met: (1) a history of widespread pain; (2) at least 11 positive tender points on physical examination; and (3) evidence that other disorders that could cause the symptoms or signs were excluded. Fibromyalgia presents a conundrum to diagnose because "[i]ts cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Gilbert v. Astrue*, 231 F. App'x 778, 783 (10th Cir. 2007) (quoting *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)) (unpublished). The disease is "poorly-understood within much of the medical community [and] . . . is diagnosed entirely on the basis of patients' reports and other symptoms." *Brown v. Barnhart*, 182 F. App'x 771, 772 (10th Cir. 2006)(quoting *Benecke v. Barnhart*, 379 F.3d 587, 59o (9th Cir. 2004))(unpublished).

Plaintiff's argument is that her records consistently document her fibromyalgia, which was first diagnosed by Judy Weiss, M.D., a rheumatologist, 11 years prior to her alleged onset date. Plaintiff refers me the various diagnoses or indications of fibromyalgia in the record and, most specifically, to an office note, dated September 25, 2001, documenting Dr. Weiss' evaluation of Plaintiff's chronic pain. [AR 842-43] Dr. Weiss reported that she "checked [Plaintiff] for trigger points characteristic of fibromyalgia" and found "13 positive points were noted out of the

14

16 that I checked." [AR 842]  Dr. Weiss' primary impression at this visit was fibromyalgia. [AR 842]  Dr. Weiss' office note from September of 2001 was not in the record when the ALJ made her determination; rather, it was subsequently provided to the Appeal Council by Plaintiff.

The Commissioner concedes that the September 2001 office note from Dr. Weiss is now part of the medical record and that it provides findings by an acceptable medical source that meet the criteria needed to establish fibromyalgia as a medically determinable impairment. *See O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994)(noting that evidence not before the ALJ may be presented to the Appeals Council and "becomes part of the administrate record to be considered when evaluating the [Commissioner's] decision for substantial evidence")(citing 20 C.F.R. §404.970(b)).  The Commissioner asserts, however, that the office note from 2001 is "not relevant to the period at issue here, and therefore should not be considered by the Court" because Dr. Weiss' assessment of fibromyalgia "predates the beginning of the period relevant this case – Plaintiff's March 19, 2013 alleged onset of disability date." [Doc #17]  I conclude, however, that although the office note was from 11 years before her onset date, it is relevant to the question of whether Plaintiff's fibromyalgia was a medically determinable impairment under SSR 12-2p (providing that, for a person with fibromyalgia, an ALJ considers "a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane").  This is particularly true when the records provided to the ALJ failed to document the objective testing underlying the diagnosis, but consistently indicated

that Plaintiff suffered from fibromyalgia. As a result, the ALJ's determination that the medical records do not contain a diagnosis of fibromyalgia was incorrect in light of the new evidence subsequently submitted by the Plaintiff.

The Commissioner goes on to argue, however, that even if the ALJ erred when ruling that Plaintiff's fibromyalgia was not a medically determinable impairment, such error was inconsequential because the ALJ went on to consider and account for Plaintiff's pain – regardless of the source of that pain – in the RFC assessment of her ability to work. The Tenth Circuit has ruled that an ALJ's error when failing to find an impairment severe at Step Two is not reversible when the ALJ finds that at least one other impairment is severe because "[a]s long as the ALJ finds one severe impairment, the ALJ may not deny benefits at step two but must proceed to the next step." *Allman v. Colvin,* 813 F.3d 1326, 1330 (10th Cir. 2016). Likewise, any error in failing to find an impairment medically determinable at Step Two is "obviated if the ALJ considered the non-medically determinable impairment in assessing the RFC." *Ray v. Colvin,* 657 F.Appx. 733 (10th Cir. 2016) (unpublished); *see also Lawrence v. Berryhill*, 2017 WL 3187637 (D. Colo. 2017) (unpublished)(ruling that while the medical records arguably supported a finding of a mentally determinable impairment of ADHD, "any error was harmless in light of the mental limitations that the ALJ took into account in assessing Plaintiff's RFC").

Plaintiff testified at the hearing that "pain in her knees, hips, left foot, lower abdomen, lower back, hands, and her migraines prevent her from performing work related activities." [AR 18] In her order, the ALJ found that "while the claimant's

16

treatment history is consistent with some degree of pain and limitation, it is not consistent with a disabling degree of symptomology." [AR 20]  The ALJ noted the conflicting objective test results that "[c]ummulatively . . . demonstrate only mild to moderate degenerative disc disease in the cervical and lumbar spine." [AR 19]  She also found that Plaintiff's "complaints of pain are not consistent with her reports . . . about her [extensive] daily activities."  [AR 20]

Plaintiff asserts that the ALJ's rulings constitute reversible error here because fibromyalgia has long been considered by the courts as having purely subjective manifestations (primarily widespread muscle and joint pain), and the ALJ in this case relied heavily on the inconsistencies between the objective evidence and Plaintiff's subjective complaints of pain when assessing her RFC.   In other words, "had the ALJ found that the medically determinable impairment of fibromyalgia had caused those symptoms [of pain,] this lack of objective evidence would not have constituted substantial evidence [sufficient] to discount them, and would likely have mandated a different result." [Doc #20]  As such, Plaintiff contends that the ALJ's failure to find that her fibromyalgia was a medically-determinable impairment was, in this particular case, reversible error.

I agree with Plaintiff.  In so doing, I first note that although the ALJ's ruling that Plaintiff's fibromyalgia was not a medically determinable impairment "due to a lack of objective evidence" was accurate at the time of her determination, the new evidence provided by Plaintiff undermines that ruling.  Furthermore, I disagree with the Commissioner there was no reversible error here because the ALJ went on

17

to consider her symptoms when assessing Plaintiff's allegations of pain and its effect on her RFC. For a reviewing court to conclude that error in a disability hearing is harmless, "it must be clear that, had the ALJ considered the appropriate material – here the medical evidence of fibromyalgia – [and] 'no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.'" *Brown v. Barnhart*, 182 F. App'x 771, 773 (10th Cir. 2006)(quoting *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004)) (unpublished).

Not only did the ALJ's failure to find Plaintiff's fibromyalgia effect the analysis at Step Two of the sequential process, it also impacted her analysis at Steps Three and Four in the determination of Plaintiff's residual functional capacity and whether her severe impairments, alone or in combination with other impairments, were equivalent to any of a number of listed impairments so severe as to preclude substantial gainful employment. Furthermore, when assessing Plaintiff's allegations of disabling pain, the ALJ found that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." [AR 18] This determination could also have been negatively impacted by the failure to find that her fibromyalgia was a medically determinable impairment. The ALJ's determination that the claimant "was not totally credible with respect to her physical limitations is made problematic by [her] refusal to consider her fibromyalgia." *Brown v. Barnhart, supra*, 182 F. App'x at 773 (indicating that

18

"normal muscle strength and a lack of results from objective laboratory tests for the presence or severity of fibromyalgia do not rule out the possible existence of the condition")(citing *Green-Younger v. Barnhart*, 335 F.3d 99, 109 (2d Cir. 2003)). As such, I cannot say that under the circumstances presented here that the failure to find Plaintiff's fibromyalgia was a medially determinable impairment at Step Two constituted harmless error.

## VII. REMAND

Therefore, on remand, I direct the ALJ to address and consider the new evidence submitted by Plaintiff supporting her fibromyalgia diagnosis, and a determination whether her fibromyalgia is a medically determinable impairment at Step Two pursuant to SSR 12-2p. If the ALJ finds that it is, I direct further analysis through the sequential evaluation process that addresses Plaintiff's claims on appeal related to the ALJ's RFC assessment of Plaintiff's functional limitations and the weight given to the opinion evidence of record.

ACCORDINGLY, for the foregoing reasons, I REVERSE the Commissioner's final order and REMAND for further proceedings consistent with this opinion.

Dated: December 18, 2018 in Denver, Colorado.

BY THE COURT:

  s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE